Michael J. Manning, Esq. (SBN 286879)
**MANNING LAW, APC**
26100 Towne Centre Drive
Foothill Ranch, CA 92610
Office: (949) 200-8755
Email: privacy@manninglawoffice.com

Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff: KIRRA HANSON

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KIRRA HANSON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BLOOMINGDALES.COM, LLC, an Ohio limited liability company; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 5:25-cv-00494-AB-SHK<br>Judge: Hon. Andre Birotte, Jr.<br><br>**FIRST AMENDED COMPLAINT**<br><br>1. Cal. Penal Code § 638.51<br>2. Cal. Constitution Art. I § 1<br>3. Cal. Civil Code § 1798.100*, et seq.*<br>4. Cal. Bus. & Prof. Code § 17200, *et seq*.<br>5. Intrusion Upon Seclusion<br>6. Unjust Enrichment<br><br>**CLASS ACTION** |

# I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.bloomingdales.com (the "Website"), a website that Defendant owns and operates.

2. Plaintiff KIRRA HANSON files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against BLOOMINGDALES.COM, LLC ("Defendant" or "Bloomingdales"), an Ohio limited liability company that owns and operates the Website. Plaintiff brings this action based upon personal knowledge of the facts pertaining to her, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

3. Bloomingdales surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

4. To achieve these goals, Bloomindales enables third-party technologies that function as unlawful pen registers and/or trap and trace devices, capturing detailed information about users' electronic communications—such as IP addresses, session data, clickstream activity, and form inputs—in real time. These tools operate covertly and without judicial authorization where, as here, Plaintiff and Class Members did not consent to the interception, nor did Defendant secure a court order permitting such surveillance.

5. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website to monitor user interactions. These trackers typically take the form of a small, invisible image (often 1x1 pixels in size) or a lightweight JavaScript snippet that executes when a user loads a webpage or completes an action.

6. When triggered, the pixel sends data—such as page views, session duration, referrer URLs, IP address, and browser details—from the user's browser to a

third-party server. Pixel trackers are widely used in digital marketing and analytics to assess user engagement, measure campaign performance, and personalize advertising.

7. When users visit the Website, Defendant causes dozens of trackers to be embedded on Website visitors' internet browsers, including but not limited to:

- TikTok Tracker
- Google Marketing Platform (including Google Analytics, Google Tag Manager and DoubleClick)
- Facebook Pixel (including Instagram Ads and Meta Business Tools)

8. The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website as described herein for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies that go beyond Defendant's direct needs for their own financial gain.

9. The above-listed trackers are referred to herein collectively as the "Trackers." On information and belief, a complete list of third-party software installed, injected, implemented and/or used by Defendant on Plaintiff's browser is identified in **Exhibit A** to this complaint.

10. The Trackers are operated by separate and distinct third parties TikTok, Inc. (TikTok Tracker), Google, LLC (Google Marketing Platform) and Meta Platforms, Inc. (Facebook Tracker) (collectively the "Third Parties"). Defendant enables the Trackers, which cause user data to be transmitted to third-party servers to collect Website visitors' IP address and other information, to identify them, and to facilitate the monetization of user data through targeted marketing and advertisement brokerages.

11. Through the Trackers, the Third Parties collect Website users' information including IP addresses, device and browser type, screen resolution, operating system, pages visited, time spent on each page, scroll depth, mouse movements, clicks, referring URLs, unique identifiers (such as cookies and advertising

IDs), geographic location based on IP, user session duration, form interactions, and behavioral data used for profiling, ad targeting, cross-device identification, and/or real-time bidding (the "User Information"). Defendant and the Third Parties then use the User Information for hyper-targeted marketing and advertising and to generate revenue.

12. Because the Trackers capture users' IP addresses, which constitute "routing, addressing, or signaling information," the Trackers are a "pen register" and/or "trap and trace device" as defined by the California Invasion of Privacy Act ("CIPA"). *See* Cal. Penal Code § 638.50(b), (c); *see* also *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

13. Plaintiff and the Class Members did not consent to the Trackers being installed on their devices and did not expect disclosure and/or monetization of their information. By installing and using the Trackers without prior consent and without a court order, Defendant violated CIPA section 638.51.

14. Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents.

15. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II. PARTIES

16. Plaintiff KIRRA HANSON ("Plaintiff") is a California resident residing in San Bernardino County and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred on multiple instances during the class period prior to the filing of the original complaint in this matter. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17. Defendant BLOOMINGDALES.COM, LLC is an Ohio limited liability company that owns, operates and/or controls the Website which is an online platform that offers goods and services for sale to consumers.

/ /

/ /

## III. JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

19. This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Central District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

20. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (4) the injury to Plaintiff occurred within this District.

## IV. FACTUAL ALLEGATIONS

### 1. *The California Invasion of Privacy Act (CIPA)*

21. Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

22. CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

23. A "pen register" is defined as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

24. Conversely, a "trap and trace device" captures incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, again excluding the contents (Cal. Penal Code § 638.50(b)).

25. In practical terms, a pen register records outgoing dialing information, while a trap and trace device records incoming dialing information.

26. Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing numbers dialed from a specific line and trap and trace devices recording incoming call numbers to that line.

27. Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line—essentially capturing the user's outgoing information.

28. Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line—capturing the incoming information.

29. Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme (*In re Google Inc.*, 2013 WL 5423918, at *21; *Greenley*, supra, 2023 WL 4833466, at *15; *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1). This interpretation aligns with the principle that CIPA should be

construed to provide the greatest privacy protection when faced with multiple possible interpretations (*Matera v. Google Inc.*, 2016 WL 8200619, at *19).

30. The alleged conduct by the defendant constitutes an invasion of a legally protected interest that is both concrete and particularized. Violations of the right to privacy have long been actionable at common law (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019)). The right to privacy encompasses an individual's control over personal information (*Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017)).

31. Both legislative history and statutory text indicate that Congress and the California Legislature intended to protect these historical privacy rights when enacting CIPA (Cal. Pen. Code § 630). Therefore, CIPA codifies a substantive right to privacy, the violation of which results in a concrete injury sufficient to confer standing (*Campbell v. Facebook, Inc.*, —F.3d—, 2020 WL 1023350, at *7–8; *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020)).

32. Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)).

***2. The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

33. When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources—including HTML, cascading style sheets (CSS), JavaScript files, and image assets—used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. ***Figure 1*** below illustrates sample HTTP requests.

/ /

/ /

***Figure 1***




34. The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, referred to herein as the Trackers, initiated client-side functions that observed user interactions, extracted metadata from the browser environment, and transmitted that data to external third-party servers. The transmitted data—referred to as User Information—included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

35. The Trackers operate by initiating HTTP or HTTPS requests—using either the GET or POST method—from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and device metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

36. An Internet Protocol (IP) address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.* (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). IP addresses enable routing of data between devices

and can be used—via external geolocation services—to infer a user's general location, including state, city, and in some cases, ZIP code.

37. Public IP addresses are unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access and can be used to approximate a device's physical location through geolocation services.

38. In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. They are isolated from the global Internet and can be reused across different networks without conflict. Unlike public IP addresses, private IP addresses do not divulge a user's geolocation.

39. Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting—particularly when combined with other tracking identifiers and third-party enrichment.

40. A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

41. As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination,

such as a website or email server.

42. As alleged, the Defendant installs each of the Trackers on the user's browser for marketing and analytics purposes, and the Trackers collect pieces of User Information, including users' IP addresses, that identifies the outgoing "routing, addressing, or signaling information" of the user. Therefore, the Trackers are each considered "pen registers" and/or "trap and trace devices."

**3. *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

43. Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

44. This process, known as digital fingerprinting, involves compiling various data points—such as browser version, screen resolution, installed fonts, device type, and language settings—to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

45. When combined with additional tracking mechanisms—such as cookies, login data, and third-party enrichment services—fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities.

46. A sufficiently detailed digital fingerprint—especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases—can enable the reidentification of a user.

47. The ability to associate a persistent digital profile with a specific

individual—using techniques such as digital fingerprinting—has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

48. In simpler terms, pen register and trap and trace mechanisms in the digital context refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics—information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers embedded in the Website, which operate without user interaction or visibility.

49. The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

50. When users visit the Website, embedded Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

/ /

/ /

**4. *Plaintiff And Class Members' Data Has Financial Value***

51. Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[1]

52. Consumers' web browsing histories have an economic value more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year. *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

53. There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories." *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

54. Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[2]

55. In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number,

---

[1] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

[2] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

$3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[3]

56. The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[4]

57. The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

### 5. *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent*

58. By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build

---

[3] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[4] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

"lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

59. Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data—such as IP address, device type, screen resolution, and referral information—to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite private implications to users.

60. IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

61. When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers—such as IP addresses, device IDs, and cookies—with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked

across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

### 6. *The Trackers Function Together to Achieve Targeted Objectives*

62. When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

63. On information and belief, the Trackers operate in concert with the additional tracker technologies listed in **Exhibit A**, among others, as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

64. When a user visits the Website, third-party scripts and tracking pixels—including those deployed by the Trackers—are automatically executed by the user's browser without any visible indication. These tracking technologies immediately begin collecting behavioral data in real time, including the specific pages visited, user clicks, purchase activity, and time spent on each page. This information is then transmitted to external third-party servers without the user's knowledge or affirmative action, enabling continuous monitoring and profiling of user engagement and on-site behavior.

65. Google and Facebook collect detailed behavioral data through their embedded analytics tools and social tracking pixels, capturing engagement metrics such as clicks, time on page, and conversions.

66. Platforms such as Google Ads and Meta (Facebook and Instagram)

participate in real-time bidding ecosystems, where they evaluate user behavior and metadata collected on the Website to determine eligibility for targeted advertisements. These platforms analyze whether a given user matches advertiser-defined criteria, such as interest categories, demographics, or purchase intent.

67. To enhance the accuracy of targeted advertising, these platforms may also rely on cookie syncing, browser fingerprinting, and identity resolution tools that link a user's behavior across multiple sessions and devices. These systems allow advertisers to display personalized ads to users who previously visited the Website, or to reach similar audiences based on behavioral profiles.

68. The embedded Third Parties exchange and synchronize user identifiers through backend cookie-matching techniques and server-to-server communication, allowing them to jointly maintain up-to-date user profiles. These identifiers are shared across platforms without the user's knowledge or consent, enabling persistent tracking and targeted advertising across unrelated websites and sessions. Together, these entities operate as a coordinated, real-time surveillance network that monetizes users' attention, behavior, and identity at scale.

69. The Website allows users to browse its content and navigate across multiple webpages without ever being prompted to set or manage cookie preferences. As a result, the Trackers—including those that enable behavioral profiling and third-party data sharing—are deployed automatically, without the user's awareness or any opportunity to provide informed consent.

## V. <u>SPECIFIC ALLEGATIONS</u>

### *1. The TikTok Tracker*

70. The TikTok tracker is a piece of software code that Defendant placed on its Website that allows Defendant to share Website events with TikTok.

71. TikTok tracker's tracking mechanisms, including its use of pixels, collect and process user data in real-time and track user interactions, such as page visits and actions taken on those pages. It is designed to analyze Website data and marketing

campaigns, conduct targeted advertising, and boost revenue through the surreptitious collection of Plaintiff's and Class Members' data.

72. The status code 200 OK indicates that the server successfully received and processed the data transmitted from the user's browser. In the context of a POST request, a 200 OK response confirms that browser session information and interaction metadata were sent to, and accepted by, the third party's servers without error—thereby establishing the transmission of user data to a third-party tracking service.

73. ***Figure 2*** below is a screenshot of the Website that shows an HTTP request to analytics.tiktok.com initiated via a pixel JavaScript loader, returning a 200 OK status code. This confirms that the TikTok tracker was successfully loaded and executed. It serves as evidence of behavioral tracking initialized on the Website, which constitutes signaling metadata transmission:

***Figure 2***




74. The TikTok tracker begins to collect information the moment a user lands on the Website and immediately starts sending information to TikTok regarding the user's visit. The TikTok Tracker gathers device and browser information, geographic information, referral tracking, and URL tracking by running software code on the

Website to send user details to TikTok. TikTok acknowledges that the TikTok tracker automatically collects Plaintiff and Class Members' IP address and sends that information to TikTok.[5]

75. ***Figure 3*** below shows a DNS query and successful resolution for analytics.tiktok.com, confirming that the browser attempted to communicate with TikTok's server even before or immediately after consent. This DNS transaction constitutes a direct signal to a third-party tracker:

***Figure 3***




76. The collection of Plaintiff's and Class Members' personally identifying and/or non-anonymized information through Defendant's installation and use of the TikTok tracker constitutes an invasion of privacy and violates CIPA. Cal. Penal Code § 638.51(a).

77. According to a leading data security firm, the TikTok tracker secretly installed on Defendant's website is particularly invasive. The Tik Tok tracker "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health." The pixel also collects "names, passwords and authentication codes" and "transfer the data to

[5] https://ads.tiktok.com/help/article/tiktok-pixel?q=tiktok%20pixel&redirected=1

locations around the globe, including China and Russia", and does so "before users have a chance to accept cookies or otherwise grant consent."[6]

78. The TikTok tracker runs on virtually every page of Defendant's Website, sending to TikTok information regarding the Website user's interest in Defendant's products and/or services.

79. The Website instantly sends communications to TikTok when a user lands on the Website and when a user clicks on links to various pages contained within the Website.

80. The TikTok tracker provides an optional feature called Auto Advanced Tracking that automatically identifies and captures customer information (such as email addresses and phone numbers) from form fields on web pages where the TikTok tracker is installed. This information is matched with TikTok users to enhance ad targeting and attribution.

81. Auto Advanced Matching is an optional TikTok feature designed to enhance the accuracy of user identification and ad targeting by capturing user information such as email addresses and phone numbers from form fields on websites where the TikTok tracker is installed. When a user inputs their information on a website with the pixel, Auto Advanced Matching identifies and captures the data from form fields, transferring it to TikTok via HTTPS and matching it with users on the platform to optimize ad campaigns and improve attribution of events to TikTok ads.

82. Defendant has implemented Auto Advanced Tracking on the Website. With Auto Advanced Matching implemented, the TikTok tracker scans the user's interaction with the Website for information, such as name, phone number and address, and simultaneously sends the information to TikTok to isolate with certainty the individual to be targeted, including Plaintiff and the Class Members.

---

[6] Aaron Katersky, TikTok Has Your Data Even If You've Never Used The App: Report, ABC News (last accessed October 2024), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249

83. ***Figure 4*** below is a screenshot of the Website that shows that the TikTok pixel included Auto Advanced Matching field—specifically *raw_email, hashed_email, and raw_phone*—and although these fields are marked as "missing," their inclusion in the payload structure confirms that the Auto Advanced Matching feature is active on the site:

***Figure 4***




84. By sharing Plaintiff's and Class Members' personal and de-anonymized data with TikTok, Defendant effectively "doxed" them to America's most formidable geopolitical adversary without informing them that the Website is collaborating with the Chinese government to obtain their identifying information. By sharing Plaintiff's and Class Members' personal and de-anonymized data with TikTok, Defendant effectively "doxed" them to America's most formidable geopolitical adversary. There is evidence that sharing data with TikTok, whose parent company ByteDance, has drawn national security scrutiny. Former employees have testified that data stored on TikTok systems was accessible by ByteDance staff in China.

85. The TikTok tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

86. The TikTok tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

87. The TikTok tracker functions as a pen register or trap and trace device because it is designed to capture and transmit addressing, signaling, and routing information associated with a user's interactions on a website, including such information as page URLs, video identifiers, device and browser metadata, IP address, click paths, scroll depth, and session timestamps. This data reveals the origin and destination of electronic communications, closely analogous to how a traditional pen register captures dialed numbers and a trap and trace device records incoming call data. By systematically logging which content the user accessed (i.e., the "addressed" destination), the technical attributes of the user's system (i.e., the "signaling"), and the communication route (i.e., IP routing and timestamps), the TikTok tracker enables TikTok to identify patterns of communication behavior, monitor content consumption in real time, and attribute it to specific individuals or devices.

88. Defendant never obtained a court order permitting the installation of a pen register device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the TikTok Tracker on Plaintiff's and Class Members' browser or to collect or share data with TikTok.

89. Consequently, the Defendant's secret installation of the TikTok tracker violates CIPA regarding unauthorized use of a pen register without prior consent or court order.

**2. *The Google Marketing Platform***

90. The Google Marketing Platform is a central pillar of the surveillance advertising ecosystem, acting as both a data collector and a real-time advertising engine that coordinates seamlessly with other Trackers. It combines tools like Google Analytics (for measuring user behavior), Google Tag Manager (for deploying tracking scripts without altering code), Google Ads (for buying and targeting ads), and Display

& Video 360 (a demand-side platform for real-time bidding).

91. ***Figure 5*** below is a screenshot of the Website that shows a request to google-analytics.com, successfully returning with a 200 OK status. This indicates that the Google Analytics tracker was embedded and triggered on the site, enabling collection of session, event, and behavioral data:

***Figure 5***




92. When a user visits the Website, Google Analytics begins collecting granular behavioral data—such as page visits, scroll depth, session duration, and conversions—while DoubleClick (now integrated into Display & Video 360) assesses browser events (e.g., loading a bidding pixel) trigger ad calls where Google matches identifiers in their ad system for real-time ad auction eligibility.

93. ***Figure 6*** below confirms DNS resolution for google-analytics.com, validating that the domain was contacted from the browser and the connection reached Google's analytics infrastructure:

/ /

/ /

***Figure 6***




94. Google associates the behavioral data collected through its tools—such as page views, session duration, and conversions—with user identifiers, including cookies and IP addresses. In some configurations, Google may also use additional device or browser characteristics for fraud detection or probabilistic identification. This data is integrated into Google's advertising ecosystem, which spans millions of websites and applications. Through Google Tag Manager, the Website may also deploy additional third-party trackers—such as Facebook—enabling dynamic and coordinated data collection across multiple advertising platforms.

95. ***Figure 7*** below shows a successful HTTP GET request to doubleclick.net, specifically loading an ad impression script. The response confirms that user metadata is being shared with Google's advertising platform:

//

//

//

//

//

//

***Figure 7***




96. ***Figure 8*** below shows the DNS resolution event for doubleclick.net, confirming that the tracking service was contacted from the browser:

***Figure 8***




97. Importantly, Google retains much of this behavioral and demographic data for its own advertising purposes, enabling cross-site tracking, audience profiling, and predictive targeting for countless other advertisers—whether or not the user ever clicks an ad or makes a purchase. As a result, Google acts as a data controller in some

contexts, particularly when logged-in user behavior is involved.

98. Defendant surreptitiously installed the Google Marketing Platform by copying Google's JavaScript code snippet and adding it to the Website. When a user visits the Website, their browser executes the JavaScript code which sends data about the user's interactions, including the user's IP address, to Google's servers.

99. The Google Marketing Platform is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

100. The Google Marketing Platform is at least a "device" because for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

101. The Google Marketing Platform collects incoming information from Website users such as behavioral data, device information, device identifiers (such as browser, operating system, screen resolution, language, etc.), referrer data (where the user came from before landing on the Website), and conversion events (purchases, form fills and logins). Likewise, the Google Marketing Platform collects outgoing information from Website users such as user profile information, auction parameters (such as device, location and inferred interests), and aggregated conversion data.

102. Because the Google Marketing Platform captures incoming and outgoing information such as IP addresses and User Information as well as other highly specific user behavior from visitors to Defendant's website, it is a "pen register" and a "trap and trace device." Cal. Penal Code § 638.50(b) and (c).

103. Defendant never obtained a court order permitting the installation of a pen register device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Google Marketing Platform on Plaintiff's and Class Members' browser or to collect or share data with Google.

104. Consequently, the Google Marketing Platform violates CIPA regarding unauthorized use of a pen register without prior consent or court order.

/ /

### 3. *The Facebook Pixel*

105. The Facebook Pixel a/k/a Meta Pixel is a piece of JavaScript code that allows Defendant to track all user interactions on the Website. The pixel code is added to the Website's source code and is designed to run on pages of the Website.

106. ***Figure 9*** below is a screenshot of the Website that shows an HTTP request to connect.facebook.net, indicating the loading of the Meta Pixel. The request succeeded with a 200 OK status code. This confirms a connection to Meta's tracking infrastructure, which collects routing metadata and user behavior analytics:

***Figure 9***




107. When a user visits the website and performs specific actions like viewing a product, adding an item to their cart, or completing a purchase, the pixel is triggered, places cookies in the user's browser, and monitors their behavior across devices and sessions. The pixel enables Meta to associate user behavior across devices using its internal identity system.

108. ***Figure 10*** below shows the DNS resolution for facebook.com or connect.facebook.net. This confirms the establishment of communication between the user's browser and Facebook's servers without visible user consent:

/ /

***Figure 10***




109. The collected data is sent to Facebook's servers and displayed in Facebook Ads Manager or Events Manager. Defendant can analyze the data to measure ad performance, track conversions, and understand customer behavior.

110. The pixel enables dynamic ad retargeting by showing personalized ads to users who have already interacted with the Website. It also helps build custom audiences (e.g., people who visited specific pages) and lookalike audiences (users similar to existing customers). Over time, as more data is collected, Facebook's algorithms optimize ad delivery by targeting users most likely to take desired actions.

111. Defendant surreptitiously installed the Facebook Tracker by copying the JavaScript code snippet and adding it to the Website. When a user visits the Website, their browser executes the JavaScript code which sends data about the user's interactions, including the user's IP address, to Facebook's servers.

112. The Facebook Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

113. The Facebook Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

114. The Facebook Tracker operates as a digital pen register and/or trap and trace device because it captures and transmits addressing, signaling, and routing information associated with a user's web activity to Meta Platforms, Inc. When embedded on a website, the Facebook Tracker logs detailed metadata such as the URL of the visited page (destination address), the referrer (origin address), timestamps, device identifiers, IP address, browser type, and user actions (e.g., clicks, form submissions, purchases). This information reveals not the content of communications but the communication path and behavior flow.

115. Defendant never obtained a court order permitting the installation of a pen register device or process and did not obtain Plaintiff or the Class Members' express or implied consent to install the Facebook Tracker on Plaintiff's and Class Members' browser or to collect or share data with Meta.

116. Consequently, the Facebook Tracker violates CIPA regarding unauthorized use of a pen register without prior consent or court order.

## VI. <u>CLASS ALLEGATIONS</u>

117. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's website during the relevant statute of limitations period.

118. **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

119. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether Defendant installed the Trackers on the Website;

b. Whether the Trackers are each a pen register and/or trap and trace device as defined by law;

c. Whether Plaintiff and Class Members are subject to same tracking policies and practices;

d. Whether Plaintiff and Class Members are entitled to statutory penalties;

e. Whether Class Members are entitled to injunctive relief;

f. Whether Class Members are entitled to disgorgement of data unlawfully obtained;

g. Whether the Defendant's conduct violates the California Constitution;

h. Whether the Defendant's conduct constitutes an intrusion upon seclusion;

i. Whether the Defendant's conduct violates the Cal. Civil Code § 1178.100, *et seq.;*

j. Whether the Defendant's conduct constitutes an unlawful, misleading, deceptive or fraudulent business practice; and

k. Whether Plaintiff and the Class Members are entitled to equitable relief for unjust enrichment.

120. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

121. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

122. **SUPERIORITY:** A class action is superior to other available methods

of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

***By Plaintiff Against All Defendants***

123. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

124. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

125. Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA.

126. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII. SECOND CAUSE OF ACTION

### Violations of Cal. Constitution Article I § 1

***By Plaintiff Against All Defendants***

127. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

128. Article I, Section 1 of the California Constitution guarantees each individual an inalienable right to privacy. This constitutional provision supports a private right of action against both governmental and private actors who engage in

conduct that constitutes a serious invasion of privacy.

129. Plaintiff and the Class Members possess a legally protected privacy interest in the confidentiality of their online behavior, communications metadata, and identifying information, including but not limited to: IP address, browser details, session identifiers, page visit patterns, and clickstream behavior.

130. Plaintiff and the Class Members had a reasonable expectation that their activity on Defendant's website—including what pages were visited, what content was interacted with, and when—would not be secretly tracked and transmitted to third parties via embedded surveillance code.

131. Without Plaintiff's or the Class Members' knowledge or consent, Defendant caused the Trackers to be deployed on the Website. The Trackers secretly transmitted Plaintiff's digital signaling data, addressing information (e.g., URLs accessed), and routing metadata (e.g., timestamps and referral paths) to the Third Parties, enabling behavioral profiling and cross-site identification.

132. Defendant's conduct constitutes a serious and egregious invasion of Plaintiff's and the Class Members' informational privacy, far exceeding any routine or incidental data handling. The deployment of real-time surveillance tools designed to accomplish identity resolution and behavioral mapping is highly offensive to a reasonable person.

133. Defendant lacked any legitimate justification for failing to disclose or obtain consent for this data interception and transfer. The magnitude of the privacy intrusion outweighed any speculative or commercial benefit to Defendant.

134. As a direct and proximate result of Defendant's actions, Plaintiff and the Class Members have suffered a loss of control over personal data, emotional distress, and a violation of their constitutional right to privacy.

/ /

/ /

## IX. THIRD CAUSE OF ACTION

**Violations of Cal. Civil Code § 1798.100, *et seq.***

***By Plaintiff Against All Defendants***

***(Injunctive Relief Only)***

135. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

136. The CCPA grants consumers legal rights subject to statutory protection, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they exercise privacy rights. Ca. Civil Code § 1798.100 *et seq*.

137. The CCPA defines "personal information" broadly to include "...information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civil Code § 1798.140.

138. The CCPA dictates specifically that "[a] third party shall not sell or share personal information about a consumer that has been sold to, or shared with, the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civil Code § 1798.115.

139. Defendant collected Plaintiff's and Class Members' personal information with the purpose of resolving their identities and locating them for targeted marketing in the course of and as part of its business with California consumers.

140. Disclosing Plaintiff's and Class Members' personal information was not reasonably necessary or proportionate to perform Defendant's reasonably expected online services.

141. By collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient

notice, Defendant violated CCPA.

142. By failing to inform Plaintiff and Class Members of the personal information collected about them and that their personal information was shared with the Third Parties, Defendant violated CCPA.

## X. FOURTH CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

***By Plaintiff Against All Defendants***

143. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

144. This cause of action is brought under California Business & Professions Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

145. Defendant has engaged in unlawful business practices by:

(a) Violating Article I, Section 1 of the California Constitution, which protects individuals from serious invasions of privacy;

(b) Violating California Penal Code §§ 638.50–638.56, including the unauthorized collection of addressing, signaling, and routing information for user identification and tracking; and

(c) Violating California Civil Code § 1798.100, *et seq.*, including collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient notice. Privacy rights rooted in the CCPA are a protected interest enforceable under Business & Professions Code § 17200. *Briskin v. Shopify, Inc.*, 101 F.4th 706 (9th Cir. 2025) (en banc).

146. Defendant has engaged in unfair business practices by embedding the Trackers into the Website and enabling the real-time capture and transmission of Plaintiff's and Class Members' personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

147. The Defendant's practices are contrary to public policy supporting consumer privacy and data autonomy, and the harm it causes to consumers, including loss of control over personal information and risk of profiling, outweighs any legitimate business justification.

148. Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices. On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

149. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data. Plaintiff's and Class Members' data—used for targeted advertising, behavioral modeling, and enrichment by third parties—constitutes digital property with measurable economic value.

150. Plaintiff on behalf of herself and on behalf of the Class Members seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of herself and on behalf of the Class Members, also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

## XI. <u>FIFTH CAUSE OF ACTION</u>

### Intrusion Upon Seclusion

***By Plaintiff Against All Defendants***

151. Plaintiff realleges and incorporates by reference all preceding paragraphs

of this Complaint as though fully set forth herein.

152. Plaintiff and the Class Members bring this cause of action for intrusion upon seclusion, a well-established common law tort recognized in California, which protects individuals from intentional invasions of their private affairs in a manner that would be highly offensive to a reasonable person.

153. At all relevant times, Plaintiff and the Class Members had a reasonable expectation of privacy in their online browsing activity, including their interactions with the Website, the specific content viewed, and the behavioral signals generated through use of the website—such as page views, click paths, session timestamps, and form entries.

154. Without Plaintiff's or Class Members' knowledge or consent, Defendant intentionally deployed the Trackers on the Website. This tool was engineered to surreptitiously capture and transmit granular behavioral data—including addressing, signaling, and routing information such as IP addresses, URL paths, referrers, device attributes, and mouse activity—to third parties.

155. The data collected was detailed and persistent, enabling Third Parties to monitor Plaintiff's and Class Members' conduct across websites, associate that behavior with unique identifiers, and build a behavioral profile of Plaintiff and Class Members for marketing and data monetization purposes.

156. Defendant's actions were intentional, systematic, and designed to operate in a manner undetectable by users. At no point did Defendant provide clear, conspicuous disclosure of this surveillance, nor did it obtain affirmative consent from Plaintiff and Class Members to conduct such monitoring or transmit the collected data to third parties.

157. The nature of this covert surveillance—especially its capacity to link online activity to identifiable users—would be highly offensive to a reasonable person, particularly in light of growing public sensitivity to privacy rights and digital surveillance.

158. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members suffered an invasion of privacy, loss of control over personal information, and emotional harm, including anxiety, indignity, and concern over being unknowingly tracked, profiled, and exposed to targeted advertising based on private digital conduct.

159. Defendant's conduct was willful, malicious, and oppressive, thereby justifying the imposition of punitive and exemplary damages.

## XII. SIXTH CAUSE OF ACTION

### Unjust Enrichment

***By Plaintiff Against All Defendants***

160. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

161. Plaintiff and Class Members bring this cause of action for unjust enrichment, asserting that Defendant has been unjustly enriched through the unauthorized and uncompensated acquisition, use, and monetization of Plaintiff's and Class Members' personal data.

162. Plaintiff and the Class Members, while visiting and interacting with the Website, unknowingly conferred a substantial benefit on Defendant by generating digital behavioral data, including but not limited to IP address, device information, browser metadata, URL paths, session timestamps, and interaction signals.

163. Defendant deployed the Trackers without Plaintiff's and Class Members' knowledge or meaningful consent. The data collected was then used by Defendant and/or third parties to conduct behavioral targeting, analytics, and advertising optimization that generated substantial financial value.

164. At no time did Plaintiff and Class Members consent to the commercial exploitation of this data. Nor was Plaintiff and Class Members informed that their online behavior would be tracked and monetized in this manner. Plaintiff and Class Members received no compensation, disclosure, or opportunity to prevent the enrichment

conferred upon Defendant.

165. Defendant's retention and use of this benefit was unjust and inequitable. The value of Plaintiff's and Class Members' behavioral data, when compiled, analyzed, and integrated into advertising algorithms or consumer profiling tools, constitutes a marketable asset in the digital economy. Defendant's ability to extract revenue from this asset without disclosure or fair exchange renders its conduct unjust.

166. Under principles of equity and good conscience, Defendant should be required to disgorge all ill-gotten gains and benefits received as a result of its unjust enrichment at Plaintiff's and Class Members' expense.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates CIPA, and the California Constitution, Business & Professions Code § 17200;
3. An order declaring that Defendant's conduct unlawfully intrudes upon the seclusion of Plaintiff and the Class Members;
4. An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;
5. An order enjoining Defendant's conduct as alleged herein;
6. Disgorgement of profits resulting from unjust enrichment;
7. Statutory penalties;
8. Prejudgment interest;
9. Reasonable attorney's fees and costs; and
10. All other relief that would be just and proper as a matter of law or equity.

//

//

Dated: June 2, 2025 **MANNING LAW, APC**

By: /s/ *Michael J. Manning*
Michael J. Manning, Esq.
Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated: June 2, 2025 **MANNING LAW, APC**

By: /s/ *Michael J. Manning*, Esq.
Michael J. Manning, Esq.
Attorney for Plaintiff

# EXHIBIT A

Criteo

AppNexus

Moat

Scorecard

Tapad

Hotjar

BlueKai

AGKN

Pubmatic

OpenX

Clarity

Rubicon